IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| RICHARD MANTICK )<br>)<br>and )<br>)<br>JESSICA MANTICK )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE UNITED STATES OF )<br>AMERICA, )<br>)<br>and )<br>)<br>MARK E. WISNER, an individual, )<br>)<br>Defendants. ) | Case No.  2:18-CV-2146 |

**COMPLAINT AND DEMAND FOR JURY TRIAL
AND DESIGNATION OF PLACE OF TRIAL**

COMES NOW, Plaintiffs Richard Mantick and Jessica Mantick, by and through counsel of record, and for their causes of action against the Defendants, hereby state as follows:

**JURISDICTION AND VENUE**

1.      Plaintiffs' causes of action arise under the Federal Tort Claims Act of 1948, 28 U.S.C. §§1346(b), 2671 *et seq.*, and 38 U.S.C. §7316(a), (f), and Kansas common law.

2.      Jurisdiction rests with this Court pursuant to 28 U.S.C. § 1346(b). The Court additionally has supplemental jurisdiction over Plaintiffs' claims against Defendant Wisner pursuant to 28 U.S.C. § 1367(a), as Plaintiffs' claims against Defendant Wisner arise out of the same case and controversy as Plaintiffs' claims against Defendant United States of America.

3.      Pursuant to 28 U.S.C. § 1391(e), venue is proper in the Judicial District where a substantial number of the events involved occurred, or where the Plaintiffs resides, if there is no real property at issue. The negligent acts described herein took place in Leavenworth County, Kansas;

Plaintiff Richard Mantick resides in Kansas; and there is no real property at issue. Venue is therefore proper in the District Court of Kansas.

4.      Plaintiffs' claims arose from negligent acts or omissions that occurred at the Dwight D. Eisenhower VA Medical Center ("VAMC") located at 4101 South 4th Street, Leavenworth, KS 66048. These acts occurred in November of 2014 and earlier.

5.      After Plaintiffs' submission of administrative FTCA claims, they received a letter denying their claims.

6.      Plaintiffs have therefore exhausted administrative remedies.

7.      Plaintiffs have exhausted any and all prerequisites to filing this lawsuit.

## PARTIES

8.      Mark E. Wisner is currently incarcerated in Leavenworth County, Kansas and can be found at Norton Correctional Facility, P.O. Box 546, 11130 Road E-4, Norton, Kansas 67654-0546. At all times relevant to this lawsuit, he was an employee, agent and/or servant of the Agency operating in the course of scope of his employment and agency, and licensed to practice as a physician's assistant, while holding himself out to the public as a medical doctor.

9.      Plaintiff Richard Mantick is a U.S. veteran, a resident of the State of Kansas, who sought medical treatment at the VAMC.

10.     Plaintiff Jessica Mantick is a resident of the State of Kansas and a married to Richard Mantick.

## FACTS COMMON TO ALL COUNTS

11.     Plaintiff Richard Mantick served in the United States Army for approximately 17 years.

12.     Plaintiff Richard Mantick was on intermittent active duty, had multiple deployments and other assignments in the Army from in or around 2000 until 2006.

13.     Plaintiff Richard Mantick has been a member of the National Guard from 2000 to the present.

14.     Plaintiff Richard Mantick has served in the National Guard as an E6 Staff Sergeant for 17 years.

15.     Plaintiff Richard Mantick was stationed in major combat areas while in the service of the United States, including Iraq. He suffers from post-traumatic stress disorder (PTSD), anxiety, back pain, and shoulder pain.

16.     Because Plaintiff Richard Mantick is an injured U.S. veteran, he contacted the VAMC to set up an initial appointment to initiate treatment.

17.     The VAMC assigned Plaintiff Richard Mantick to see a physician assistant, Defendant Wisner.

18.     Plaintiff Richard Mantick started seeing Defendant Wisner in or around September 2012.

19.     Upon information and belief, Plaintiff Richard Mantick saw Defendant Wisner between 2012 and 2014.

20.     At the time of the acts complained of herein, Defendant Wisner was the agent, actual or apparent, of the Defendant United States of America, was acting in the scope and course of his employment, and was acting in the context of providing medical services; as such, all acts of Defendant Wisner are imputed to his employer/principal, Defendant United States of America.

21.     VHA Directive 1063 provides that "PAs are professionally responsible for the patient care they provide. Although the Federal Tort Claims Act shields federal employees acting within the scope of their employment from personal liability, reporting of the PA to the National Practitioner Data Bank"

3

22.    VHA Directive 1063 provides that a collaborating physician is responsible for "Monitoring the PA's clinical activities to ensure they are within their authorized Scope of Practice and are medically appropriate. The collaborating physician must provide timely notification to the Chief of Service of any deficiencies in relationship to the PA's established Scope of Practice for corrective action."

23.    VHA Directive 1063 provides that the Facility Chief of Staff is responsible for "Ensuring that appropriate periodic evaluations and reviews of the PA's performance are conducted by the Chief of the Service to which the PA is assigned."

24.    Upon information and belief, in or around 1999, a Kansas nurse reported Defendant Wisner to the Kansas Board of Healing Arts for inappropriate, sexualized conduct with a patient and for mis-prescribing medications.

25.    Upon information and belief, in or around 2011, a Leavenworth VAMC patient had described Defendant Wisner's conduct to a VA Medical Center case-manager.

26.    Upon information and belief, in or around 2012, a VAMC patient reported Defendant Wisner's conduct to the VAMC's patient advocate office.

27.    Upon information and belief, in or around 2012, Defendant Wisner's conduct was investigated by the VAMC.

28.    Upon information and belief, in or around 2012, the VAMC found that Defendant Wisner's conduct was appropriate.

29.    Throughout Defendant Wisner's tenure working as a physician assistant for the VAMC, the VAMC was required to have a physician supervising Defendant Wisner's treatment of patients.

30.    Throughout Defendant Wisner's tenure working as a physician assistant for the VAMC, the VAMC had a physician supervising Defendant Wisner's treatment of patients.

4

31.     Upon information and belief, throughout Defendant Wisner's tenure at the VA, numerous VA patient files maintained by Defendant Wisner contained open and obvious mis-prescription and over-prescription of medications to veterans that his supervising physicians knew or should have known indicated that he was providing negligent care to veterans.

32.     Defendants knew or should have known that Defendant Wisner had victimized other veterans at the Leavenworth and Topeka VA medical centers; that he was a danger to his patients; that he was an impaired practitioner; that he had propensities and a history of providing improper medical care and/or had propensities and a history of violating patient boundaries.

33.     Defendants failed to monitor Defendant Wisner's clinical activities to keep them within the authorized scope of practice and medically appropriate as required pursuant to VHA Directive 1063.

34.     Defendants failed to monitor Defendant Wisner's clinical activities to keep them within the authorized scope of practice and medically appropriate as required pursuant to the physician assistant licensure act, K.S.A. § 65-2801, et seq.

35.     Defendants failed to monitor Defendant Wisner's clinical activities to ensure the presence of ongoing competency.

36.     Defendants failed to monitor Defendant Wisner's clinical activities to ensure the presence of ongoing medical appropriateness.

37.     Defendants failed to take appropriate action to correct and/or stop his inappropriate conduct, including but not limited to: removing Defendant Wisner from patient care, the use of chaperones, or termination and report to the Kansas Board of Healing Arts.

38.     Conducting physical examinations of patients is within the scope of practice for a physician assistant working at the VAMC.

39.     Physician assistants are required to give physical examinations to patients while working at the VAMC.

40.     Physician assistants are required to give physical examinations to patients' genitalia while working at the VAMC.

41.     Conducting physical examinations of patients was within the scope of practice for Defendant Wisner while working at the VAMC as a physician assistant.

42.     Defendant Wisner was required to physically examine patients' genitalia as part of his job duties.

43.     Prescribing medications to patients was within the scope of practice for Defendant Wisner while working at the VAMC as a physician assistant.

44.     Defendant Wisner was a physician's assistant for the VA who as part of his job duties practiced and prescribed medicine, including performance of physical exams, under the close supervision of a VA physician.

45.     Upon information and belief, Defendant Wisner was a retired Major at the time he saw patients at the VAMC.

46.     During every appointment, Defendant Wisner would:

        a.      lock the door,

        b.      ask Plaintiff Mantick about sex,

        c.      not wear gloves, and

        d.      Plaintiff Richard Mantick never saw him wash or clean his hands.

47.     Defendant Wisner performed a number of physical examinations of Plaintiff Richard Mantick, and during a number of the examinations Defendant Wisner asked Plaintiff Richard Mantick to remove his pants and lay back on the table.

48.     Defendant Wisner, without use of gloves, placed his hand on the inside of Plaintiff Richard Mantick's thigh and with his other hand massaged Plaintiff Richard Mantick's testicles and penis.

49.     During visits that were non-testicular related, Defendant Wisner would still check Plaintiff Richard Mantick's testicles, but more so his penis.

50.     As he performed inappropriate exams, Defendant Wisner made comments, such as "things are looking good down there."

51.     As he performed inappropriate exams, Defendant Wisner asked inappropriate questions about Plaintiff Richard Mantick's sex life, including how big his penis was, asking how many people Plaintiff was sleeping with, asking if Plaintiff had a problem "getting it up", and commenting that Plaintiff was likely very successful in getting laid "looking like that", while staring at Plaintiff's penis.

52.     At numerous appointment Defendant Wisner would insist that Plaintiff Richard Mantick needed a prostate exam and request that he call his office to schedule it.

53.     Plaintiff Richard Mantick never made an appointment for Defendant Wisner to check his prostate.

54.     Sometime in late 2014, the Department of Veterans Affairs mailed an extremely vague undated letter to the patients of Defendant Wisner stating that it was investigating "inappropriate conduct committed by staff of the VA Medical Center, Leavenworth, Kansas."

55.     However, Plaintiff Richard Mantick never received that letter.

56.     Instead, Plaintiff Richard Mantick learned of the allegations against Defendant Wisner in or around March 2017 while watching the news.

57.     After seeing the news story on Defendant Wisner, Plaintiff Richard Mantick contacted another veteran who confirmed the investigation into the allegations against Defendant Wisner.

58.     Upon information and belief, in or around February 2014, the VAMC started receiving complaints about the behavior of Defendant Wisner.

59.     On January 28, 2015, the Board received a letter from Defendant Wisner, which stated: "I am an impaired practitioner and not capable of patient care and I voluntarily surrender my current license 15-00385 permanently."

60.     On February 10, 2015, the Kansas Board of Healing Arts ("Kansas Board") revoked Defendant Wisner's license to practice as a physician's assistant in the state of Kansas.

61.     The Kansas Board found based on the stipulations of Defendant Wisner, that Defendant Wisner "used his position at the Dwight D. Eisenhower VA Medical Center in Leavenworth, Kansas to commit sexual battery crimes against veteran patients."

62.     The Kansas Board found based on the stipulations of Defendant Wisner, that he had acted unprofessionally; repeatedly made inappropriate sexual comments to patients, over-prescribed medication, and did not meet "the appropriate standard of care."

63.     Defendant Wisner has specifically admitted that "he performed unnecessary testicular and genital exams and performed unnecessary contact of his patients for no legitimate medical purpose".

64.     VAMC policy requires that physicians and directors provide "appropriate clinical oversight, consultation, and patient care management assistant to the PA assigned."

65.     VAMC policy requires that physicians are responsible for "[m]onitoring the PA's clinical activities to ensure they are within their Scope of Practice and are medically appropriate" and providing timely notification to supervisors of any deficiencies in the physician assistant's performance.

66.     At all times, Defendant Wisner was under the oversight of the VAMC.

67.     VAMC was aware of Defendant Wisner's behavior and failed to investigate.

68.    VAMC was aware of Defendant Wisner's behavior and allowed him to continue working.

69.    VAMC was aware of Defendant Wisner's behavior and failed to notify Plaintiff Richard Mantick of Defendant Wisner's behavior.

70.    VAMC was aware of Defendant Wisner's behavior and attempted to cover up Defendant Wisner's behavior.

71.    After Defendant Wisner was no longer working at the VAMC its employees were instructed to tell patients that Defendant Wisner had quit.

72.    When patients complained that Defendant Wisner may have been acting inappropriately, VAMC employees told patients that Defendant Wisner would be retiring.

73.    At all times relevant to the allegations set forth herein, Defendant Wisner held a current federally active license to practice as a physician assistant in the United States government or any of its departments, bureaus or agencies.

74.    Defendant Wisner willfully and repeatedly violated the physician assistant licensure act, the pharmacy act of the state of Kansas, or the uniform controlled substances act, or any regulations adopted pursuant to these acts by repeatedly having inappropriate contact with his patients, making inappropriate comments to his patients, overprescribing medications to his patients and not meeting the appropriate standard of care while under the supervision of a supervising physician.

75.    Defendant Wisner practiced as a physician assistant without the reasonable skill and safety to patients as evidenced by his improper contact with his patients while under the supervision of a supervising physician.

76.    Defendant Wisner prescribed controlled substances to patients in an excessive, improper, and inappropriate manner or quantity while under the supervision of a supervising physician.

77.     Defendant Wisner committed conduct likely to deceive, defraud, or harm the public when Defendant Wisner had inappropriate contact, made inappropriate comments, overprescribed medications and did not meet the appropriate standard of care for his patients while under the supervision of a supervising physician.

78.     Defendant Wisner committed acts of abuse, misconduct, and exploitation of patients while employed by the VAMC while under the supervision of a supervising physician.

79.     Defendant Wisner and the VAMC failed to keep written medical records that accurately described the services rendered to his patients while under the supervision of a supervising physician.

80.     Defendant Wisner performed unnecessary testicular and genital exams and performed unnecessary contact of his patient's person while under the supervision of a supervising physician.

81.     Defendant Wisner committed repeated acts of professional incompetency on patients at VAMC while under the supervision of a supervising physician.

82.     Defendant Wisner failed to adhere to the applicable standard of care to a degree that constitutes ordinary negligence when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, failed to wear gloves and did not refer patients as needed while under the supervision of a supervising physician.

83.     Defendant Wisner engaged in a pattern or practice or other behavior with patients that demonstrated a manifest incapacity or incompetence to perform professional services as a physician assistant when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, failed to wear gloves and did not refer patients as needed while under the supervision of a supervising physician.

84.     Plaintiff Jessica Mantick has lost the society, conjugal fellowship, love, affection, consortium and companionship of her husband, and will continue to suffer those losses in the future.

85.     Upon information and belief, after leaving the VAMC Defendant Wisner continued in the employ of the United States Army conducting periodic health assessments.

86.     On or about June 25, 1987, Defendant Wisner was arrested in San Bernardino, California for "Disorderly Conduct: Solicit Lewd Act".

87.     Upon information and belief, the VAMC knew or should have known of Defendant Wisner's arrest in 1987 because it was available through the National Crime Information Center ("NCIC").

88.     Upon information and belief, Defendant Wisner was accused of sexual assault sometime in 2012 while working at the VAMC.

89.     VHA Handbook 1100.19 applies to credentialing physician's assistants at VA medical centers, and that it requires the VA to conduct credentialing checks prior to a new hire, reappointment or transfer, specifies that the service chief is responsible for "[r]eviewing all credentials … and for making recommendations regarding appointment and privileging action; documenting these recommendations in VetPro; and … [m]onitoring and surveillance of the professional competency and performance of those who provide patient care services…. This includes both the focused professional practice evaluation for new privileges (practitioners new to the facility as well as practitioners requesting new privileges) and the ongoing monitoring and continued surveillance over time."

90.     VHA Handbook 1100.19 further states: "The credentialing process includes verification, through the appropriate primary sources, of the individual's professional education; training; licensure; certification and review of health status; previous experience; professional references; malpractice history and adverse actions; or criminal violations, as appropriate." The credentialing process also includes screening through the appropriate State Licensing Board.

91.     VHA Handbook 1100.19 further states: "(1) Each privileged health care practitioner must have a Credentialing and Privileging file established electronically in VetPro with any paper documents maintained … (2) Information obtained, to be used in the credentialing process, must be primary source verified … and documented in writing, either by letter, report of contact, or web verification. …"

92.     VHA Handbook 1100.19 further states that VA medical practitioners, where required by the Drug Enforcement Agency to be certified by the DEA to prescribe controlled substances, the VA must physically view the DEA certification prior to appointment or reappointment.

93.     Specification that VHA Handbook 1100.19 further states when at the time of an initial appointment or after a reappraisal, the VA must obtain and file in VetPro information about any "involvement in administrative, professional or judicial proceedings"; and information about any malpractice proceedings.

94.     Specification that VHA Handbook 1100.19 further states that at the time of any reappointment, initial reappointment or transfer, the VA must check the National Practitioner Data Bank regarding any information on the practitioner, and the VA must monitor any information that calls into question the professional competence or conduct of an individual, documenting efforts to obtain more information every 30 days until all necessary information is collected and determined.

95.     Specification that VHA Handbook 1100.19 further states: Physician Assistants must be reappraised periodically, and the reappraisal process "must include: the practitioner's statements regarding successful or pending challenges to any licensure or registration; limitation, reduction or loss of privileges at another hospital; loss of medical staff membership; pending malpractice claims or malpractice claims closed since last reappraisal or initial appointment; mental and physical status; and any other reasonable indicators of continuing qualification and competency."

96.    An averment that VA supervisory employees failed to perform actions required by VHA Handbook 1100.19.

97.    The VAMC was required to follow VHA Directive 1063 while Defendant Wisner was employed by the VAMC.

98.    The VAMC failed to follow VHA Directive 1063 while Defendant Wisner was employed by the VAMC.

99.    VHA Directive 1063 requires the VA supervising physician to randomly sample five patient encounters each quarter and engage in weekly management sessions with physician assistants.

100.    VA supervisory employees with oversight over Wisner failed to perform the required actions contained in VHA Directive 1063.

101.    VHA Directive 2012-030 required that Wisner be subjected to a screening by checking with the HIDPB database, which collects, among other facts, information regarding "health-care related criminal convictions."

102.    VA supervisory employees failed to perform the required actions contained in VHA Directive 2012-30, and all preceding regulations.

103.    As a result of Wisner's conduct, Plaintiffs suffered extreme, long-lasting, medically significant emotional distress for which medical treatment is necessary.

104.    An averment that Defendants failed to abide by VHA Directive 2004-029, which required specific mandated acts of supervision, including:

    a.  The VA must prepare a "Scope of Practice" for each PA to "**ensure** that Pas practice medicine as agents of their supervising physician with defined levels of autonomy."

    b.  The Scope of Practice "**must** contain and address" the PA's routine duties, including performing "initial histories and physical examinations."

    c.  "The chief of the clinical service, to which the PA is assigned, should **ensure** that clinical activities of Pas are monitored and evaluated. The Chief of Staff (COS) is responsible for seeing that such reviews are conducted and for assuring that clinical service chiefs take appropriate action to correct discovered deficiencies."

d. "The COS, or the chief of the clinical service, **must** appoint a member of the regular physician staff to be the official supervisor (hereinafter designated as the "supervising physician) of each PA."

e. "[I]t is **imperative** that the scope of each supervising physician's duties be clearly spelled out so that there is no ambiguity as to who is responsible for the action of the PA at any time or in any circumstance."

f. "The effectiveness of the supervising physician in overseeing the work of the assigned PAs **must** be reflected in their proficiency reports."

g. "Each supervising physician is responsible for the supervision of only those numbers of PAs, which the physician can effectively manage."

h. "A PA **must not** function in a patient care role without a specifically designated supervising physician."

i. "A structured review of the PA's performance by the supervising physician **must** be conducted every 2 years" and "**needs to include**" an overall assessment, results of "departmental/service monitoring and evaluation, drug utilization review, blood use evaluation, medical record review, or … any other objective quality improvement data available."

j. "The chief of the clinical service, to which the PA is assigned, **needs to monitor** this review process and concur."

105.    KSA 60-513(c) states:

A cause of action arising out of the rendering of or the failure to render professional services by a health care provider shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four years beyond the time of the act giving rise to the cause of action.

106.    KSA 40-3401(f) defines a "health care provider" as follows:

"Health care provider" means a person licensed to practice any branch of the healing arts by the state board of healing arts, a person who holds a temporary permit to practice any branch of the healing arts issued by the state board of healing arts, a person engaged in a postgraduate training program approved by the state board of healing arts, a medical care facility licensed by the state of Kansas, a podiatrist licensed by the state board of healing arts, a health maintenance organization issued a certificate of authority by the commissioner, an optometrist licensed by the board of examiners in optometry, a pharmacist licensed by the state board of pharmacy, a licensed professional nurse who is authorized to practice as a registered nurse anesthetist, a

14

licensed professional nurse who has been granted a temporary authorization to practice nurse anesthesia under K.S.A. 65- 1153, and amendments thereto, a professional corporation organized pursuant to the professional corporation law of Kansas by persons who are authorized by such law to form such a corporation and who are health care providers as defined by this subsection, a Kansas limited liability company organized for the purpose of rendering professional services by its members who are health care providers as defined by this subsection and who are legally authorized to render the professional services for which the limited liability company is organized, a partnership of persons who are health care providers under this subsection, a Kansas not-for-profit corporation organized for the purpose of rendering professional services by persons who are health care providers as defined by this subsection, a nonprofit corporation organized to administer the graduate medical education programs of community hospitals or medical care facilities affiliated with the university of Kansas school of medicine, a dentist certified by the state board of healing arts to administer anesthetics under K.S.A. 65-2899, and amendments thereto, a psychiatric hospital licensed prior to January 1, 1988, and continuously thereafter under K.S.A. 75-3307b, and amendments thereto, or a mental health center or mental health clinic licensed by the state of Kansas. On and after January 1, 2015, "health care provider" also means a physician assistant licensed by the state board of healing arts, a licensed advanced practice registered nurse who is authorized by the state board of nursing to practice as an advanced practice registered nurse in the classification of a nurse-midwife, a licensed advanced practice registered nurse who has been granted a temporary authorization by the state board of nursing to practice as an advanced practice registered nurse in the classification of a nurse-midwife, a nursing facility licensed by the state of Kansas, an assisted living facility licensed by the state of Kansas or a residential health care facility licensed by the state of Kansas. "Health care provider" does not include:

(1) Any state institution for people with intellectual disability;

(2) any state psychiatric hospital;

(3) any person holding an exempt license issued by the state board of healing arts or the state board of nursing;

(4) any person holding a visiting clinical professor license from the state board of

healing arts;

(5) any person holding an inactive license issued by the state board of healing arts;

(6) any person holding a federally active license issued by the state board of healing arts;

(7) an advanced practice registered nurse who is authorized by the state board of nursing to practice as an advanced practice registered nurse in the classification of nurse-midwife or nurse anesthetist and who practices solely in the course of employment or active duty in the United States government or any of its departments,

bureaus or agencies or who provides professional services as a charitable health care provider as defined under K.S.A. 75-6102, and amendments thereto; or

(8) a physician assistant licensed by the state board of healing arts who practices solely in the course of employment or active duty in the United States government or any of its departments, services as a charitable health care provider as defined under K.S.A. 75-6102, and amendments thereto.

107.     KSA 40-3401(f) states "On and after January 1, 2015, 'health care provider' also means a physician assistant licensed by the state board of healing arts".

108.     KSA 40-3401(f)(8) states "'Health care provider' does not include. . . a physician assistant licensed by the state board of healing arts who practices solely in the course of employment or active duty in the United States government or any of its departments".

109.     Defendant Wisner employment by the VAMC ended prior to January 1, 2015.

110.     While employed by the VAMC, Defendant Wisner practiced solely in the course of employment for the United States government or any of its departments.

111.     During his employment by the VAMC, Defendant Wisner was not a "health care provider" as defined by KSA 40-3401.

112.     Defendant Wisner was no longer seeing patients at the VAMC on or after January 1, 2015.

113.     A memorandum dated March 30, 2016 from the U.S. Department of Veterans Affairs Office of Inspector General Office of Healthcare Inspections states:

> We found no evidence in the EHR that any documented physical examinations were inappropriately focused on the genital region in any of the alleged victims.

114.     A memorandum dated March 30, 2016 from the U.S. Department of Veterans Affairs Office of Inspector General Office of Healthcare Inspections states:

> We found concerns with Mr. Wisner's management of chronic pain in one of the alleged victims. In addition to prescribing very high doses of opioid medications for nearly two years, we found limited documentation of physical exams related to the patient's pain, infrequent evaluation of the patient's adherence to opioid therapy, and

no evidence that the patient was offered alternatives (non-narcotic options) to control his chronic pain.

115.    In 2012, a patient at the VAMC in Leavenworth alleged that Defendant Wisner had conducted an inappropriate and/or unnecessary physical exam.

116.    In 2012, a patient of Defendant Wisner's at the VAMC in Leavenworth threatened to kill Defendant Wisner.

117.    In 2012, the VAMC in Leavenworth reviewed allegations by one of Defendant Wisner's patient alleging inappropriate and/or unnecessary physical exams and found that Defendant Wisner had acted appropriately and within the scope of practice for a physician assistant.

118.    In 2012, a patient of Defendant Wisner's at the VAMC in Leavenworth was admitted as an inpatient for threatening to kill Defendant Wisner.

119.    A Memorandum of Interview dated January 27, 2015 drafted by a Special Agent for the Department of Veterans Affairs Office of Inspector General Criminal Investigations Division states:

> He then explained that his method was simply thoroughness in looking for any irregularities in their genitals. However, WISNER eventually admitted that he crossed the professional line and was excessive in his genital exams. ***Although he stated-that he never received sexual gratification from these exams***, he admitted that these exams were conducted to satisfy his own curiosity and that he ultimately hid behind his "'thoroughness" as an excuse to examine their genitals.

120.    A Statement of Probable Cause dated February 6, 2015 drafted by a Special Agent with the Department of Veterans Affairs Office of Inspector General states:

> Wisner has been a Physician Assistant (PA) at VAMC Leavenworth since September 2008. In this capacity he is required to administer physical exams for compensation and pension claims and also conducts physicals for new VAMC Leavenworth patients.

121.    The negligence of Defendant Wisner was foreseeable by Defendant United States.

122.    At the latest, sometime in 2012, Defendant United States was aware, or should have been aware, of Defendant Wisner's dangerous propensities.

123.    Defendant United States had a duty to investigate allegations against Defendant Wisner.

124.    Supervision of Defendant Wisner was within the scope and employment of his supervising physicians.

125.    Defendant Wisner's supervising physicians failed to exercise a reasonable degree of supervision over Defendant Wisner.

126.    VHA Directive 2004-029 was the policy the VA was required to follow until December 24, 2013. The regulation required a supervising physician to conduct a structured review of the assigned P.A.'s performance every two years at the time of the renewal of his or her scope of practice. The review had to include an overall assessment; results of departmental/service monitoring and evaluation, drug utilization review, blood use evaluation, medical record review, or surgical case review or any other objective quality improvement data available; and the PA's scope of practice. The PA's assigned chief of clinical service was also required to monitor the review process and concur.

127.    Plaintiff's injuries were caused by Defendant United States' violations of non-discretionary supervisory policies.

128.    Defendant United States knew that Defendant Wisner had dangerous propensities.

129.    Defendant United States should have known that Defendant Wisner had dangerous propensities.

130.    Defendant United States failed to control Defendant Wisner when it knew, or had reason to know, that Defendant Wisner had dangerous propensities.

131.    The irreparable emotional harm to the plaintiffs occurred after Defendant United States was aware of Defendant Wisner's improper behavior and failed to investigate, monitor, supervise and/or act to protect patients at the VAMC.

132.   Plaintiff consented to physical examinations by Defendant Wisner because it was required by the VAMC.

133.   Defendant United States required plaintiff to be physically examined as a condition of collecting benefits.

134.   Plaintiff was harmed by Defendant United States' failure to treat plaintiff within professionally acceptable standards.

135.   Supervising physicians at the VAMC failed to review prescriptions written by Defendant Wisner.

136.   Supervising physicians at the VAMC failed to monitor or supervise Defendant Wisner.

137.   Plaintiff's injuries were caused by the negligence of employees at the VAMC who allowed foreseeable inappropriate or unnecessary physical examinations be conducted by Defendant Wisner.

138.   Defendant Wisner's employment status with the VAMC was independent to Defendant United States' duty to supervise Defendant Wisner.

139.   Performing physical exams, including genital exams, was within the range of foreseeable activities that Defendant Wisner engaged in while carrying out the business of the VAMC.

140.   The VAMC in Leavenworth was under the control of Defendant United States.

141.   Defendant United States concealed facts needed by plaintiff to determine if he had a cause of action.

142.   Defendant United States failed supervise or monitor Defendant Wisner to verify chaperones were present during physical examinations.

143.   Defendant United States acted in bad faith in denying plaintiffs' claim.

## COUNT I
## NEGLIGENCE – MEDICAL MALPRACTICE
### Richard Mantick against All Defendants

144.     Plaintiff Richard Mantick hereby incorporates by reference the allegations contained in Paragraphs above as if fully restated herein.

145.     Defendant Wisner was a physician's assistant for the VAMC who as part of his job duties practiced and prescribed medicine and performed physical exams under the close supervision of a VAMC physician.

146.     To refill his prescription medications, Defendant Wisner required Plaintiff to undergo physical exams.

147.     Defendant Wisner owed Plaintiff Richard Mantick the duty to use that degree of learning and skill ordinarily possessed and used by members of his profession and of that school of medicine in the community in which Defendant Wisner practiced medicine.

148.     Defendants Agency and United States of America owed Plaintiff Richard Mantick a duty to exercise reasonable care as the Plaintiff's condition required.

149.     All Defendants owed Plaintiff Richard Mantick the duty of using ordinary or reasonable care and diligence in providing him medical care.

150.     All Defendants violated their duties to Plaintiff Richard Mantick when their medical treatment failed to meet the standard of care.

151.     Defendant Wisner violated the standard of care when he:

    a.     Conducted an improper and/or unnecessary examination of Plaintiff Richard Mantick's genitalia.

    b.     Attempted to conduct an improper and/or unnecessary examination of Plaintiff Richard Mantick's prostate.

      c.      Failed to recognize his own impairment and refer the Plaintiff to another practitioner.

      d.      Failed to wear gloves during any exam of Plaintiff Richard Mantick.

      e.      Used his position to elicit unnecessary private information from Plaintiff Richard Mantick.

      f.      Prescribed medication that was unnecessary and/or in the wrong dosage to Plaintiff Richard Mantick.

      g.      Predicated medication on performance of improper and/or unnecessary examination of Plaintiff Richard Mantick.

152.      In addition, Defendant Wisner admitted failing to meet the standard of care for a physician's assistant practicing in Kansas by:

      a.      Repeatedly violating "The physician assistant licensure act …, by … making inappropriate sexual comments to his patients, overprescribing to his patients, and not meeting the appropriate standard of care"

      b.      "Practicing as a physician assistant without reasonable skill and safety to his patients;"

      c.      Failing "to keep written medical records that accurately described the services rendered to his patients;"

      d.      Performing "unnecessary testicular and genital exams and performed unnecessary contact of his patients for no legitimate medical purpose;"

      e.      Committing "repeated acts of professional incompetency on patients;"

      f.      Failing "to adhere to the applicable standard of care to a degree that constitutes ordinary negligence when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, and failed to wear gloves and did not refer patients as needed;" and

g.      "[E]ngaging in a pattern or practice or behavior" with his patients that "demonstrates a manifest incapacity or incompetence to perform professional services as a physician assistant when he repeatedly performed unnecessary genital and testicular examinations, overmedicated patients, failed to wear gloves and did not refer patients as needed."

153.    Defendants Agency and United States of America violated their standard of care when they:

a.      Failed to properly supervise Defendant Wisner.

b.      Failed to adequately investigate his background.

c.      Retained him in their employment.

d.      Failed to investigate complaints about Defendant Wisner.

e.      Failed to take appropriate action when it received complaints about the behavior of Defendant Wisner.

f.      Attempted to conceal Defendant Wisner's behavior from patients.

g.      Continued to employ Defendant Wisner after receiving complaints from patients.

h.      Failed to adhere to VHA Directive 1063, which mandates "appropriate clinical oversight, consultation, and patient care management" of a physician's assistant employed by the VA; "[m]onitoring the PA's clinical activities to ensure they are within their authorized Scope of Practice and are medically appropriate"; providing "timely notification to the Chief of Service of any deficiencies in relationship to the [physician assistant's] established Scope of Practice for corrective action"; "[p]roviding input into period assessments of the [physician's assistant]…" and conducting "periodic monitoring of the [physician assistant's] clinical activities through a retrospective review of at least five randomly selected patient encounter notes each quarter to ensure the presence of ongoing competency and medical appropriateness."

22

154.    Defendant Wisner's negligent acts were performed while he was on-the-clock, on the Defendants' premises, using the Defendants' equipment, while representing himself as the Defendants' employee; were occasioned by the Plaintiffs seeking medical care; were performed amidst and in the context of the provision of medical services; and were reasonably incidental to his employment; were within the scope of his employment; and Defendants Agency and United States of America are therefore vicariously liable for the tortious acts of Defendant Wisner.

155.    As a result of the aforesaid injuries, Plaintiff Jessica Mantick has lost the society, conjugal fellowship, love, affection, consortium and companionship of her husband, and will continue to suffer those losses in the future.

156.    The resulting harms suffered by the Plaintiffs were foreseeable consequences of Defendants' negligence.

157.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered past, present and future shame, humiliation, medically significant emotional distress, loss of enjoyment of life and anger.

WHEREFORE, Plaintiffs pray for a judgment against the Defendants in an amount that is fair and reasonable for actual and compensatory damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

## COUNT II
### NEGLIGENT SUPERVISION, RETENTION AND HIRING
### All Plaintiffs against Defendants Agency and United States of America

158.    Plaintiffs hereby incorporates by reference the allegations contained in Paragraphs above as if fully restated herein.

159.   Defendant Wisner was a physician's assistant for the VAMC, who, as part of his job duties, practiced and prescribed medicine and performed physical exams under the close supervision of a VAMC physician.

160.   Defendants owed Plaintiffs the duty to exercise reasonable care to employ, supervise, control and retain a competent and careful physician's assistant to:

　　　　a.   Provide competent medical care to the Plaintiffs.

　　　　b.   Perform work which involves a risk of physical harm unless it skillfully and carefully done.

　　　　c.   Perform his duties in a reasonable manner that would avoid causing foreseeable harm to third parties.

161.   Defendants violated that duty when they failed to exercise reasonable care when they decided to employ and continue to employ Defendant Wisner.

162.   Defendants knew or should have known that Defendant Wisner was unable to provide competent medical care to the Plaintiffs or to conduct himself in a way that avoided an unreasonable risk of harm to third parties.

163.   Upon information and belief, the Defendants knew or reasonably should have known that:

　　　　a.   Defendant Wisner had victimized other veterans at the Leavenworth VAMC.

　　　　b.   Defendant Wisner was a danger to patients.

　　　　c.   Defendant Wisner was an impaired practitioner.

　　　　d.   Defendant Wisner had propensities to provide improper medical care.

　　　　e.   Defendant Wisner had propensities to violate patient boundaries.

　　　　f.   Defendant Wisner had propensities to inflict emotional distress.

　　　　g.   Defendant Wisner was behaving inappropriately with patients.

h.      Defendant Wisner's supervising physicians had not, and were not, providing the requisite level of supervision and review of his activities, patient care and records.

164.    Defendants further had knowledge and reason to believe that Defendant Wisner's particular qualities and propensities to provide inadequate and inappropriate medical care, violate patient boundaries, and to act as an impaired practitioner presented an undue risk of harm to patients and third parties.

165.    Defendants through their employees' independent acts were negligent in failing to prevent harm to Plaintiffs.

166.    Defendants knew or should have known that continued employment of Defendant Wisner would continue to expose patients and third parties, such as Plaintiffs, to potential harm.

167.    Plaintiffs' harms were within the risk created by Defendant Wisner's known propensities.

168.    Defendants had reason to believe that employment of Defendant Wisner would result in undue risk of harm to others.

169.    Defendants further knew or should have known that Defendant Wisner's conduct around patients and third parties such as Plaintiffs required reasonable control and supervision.

170.    Defendants failed to provide adequate oversight and review of Defendant Wisner's performance of his job duties.

171.    Defendants further failed to adequately supervise and control Defendant Wisner given his known propensities toward harming patients.

172.    The resulting harms suffered by the Plaintiffs were foreseeable consequences of Defendants' negligence.

173.     As a result of the aforesaid injuries, Plaintiff Jessica Mantick has lost the society, conjugal fellowship, love, affection, consortium and companionship of her husband, and will continue to suffer those losses in the future.

174.     As a direct and proximate result of Defendants' negligence, Plaintiffs suffered past, present and future shame, humiliation, medically significant emotional distress, lost enjoyment of life and anger.

WHEREFORE, Plaintiffs pray for a judgment against the Defendants in an amount that is fair and reasonable for actual and compensatory damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

## COUNT III
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### All Plaintiffs against All Defendants

175.     Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs above as if fully restated herein.

176.     Defendant Wisner's examinations of Plaintiff was committed with reckless disregard for the Plaintiff.

177.     Defendant Wisner's conduct was extreme and outrageous.

178.     Defendant Wisner's offensive inquiries into Plaintiffs' sex lives was committed with reckless disregard for the Plaintiffs.

179.     Defendant Wisner's conduct was committed within the course and scope of his employment by Defendants Agency and United States of America, and therefore Defendants Agency and United States of America are vicariously liable for Defendant Wisner's outrageous acts.

180.     Defendants Agency and United States of America's failure to supervise, control and terminate Defendant Wisner was extreme and outrageous.

181.    Defendants' conduct was the direct and proximate cause of foreseeable mental distress for the Plaintiffs.

182.    Plaintiffs' mental distress was extreme, severe, medically diagnosable and significant such that no reasonable person should be expected to endure it.

183.    As a result of the aforesaid injuries, Plaintiff Jessica Mantick has lost the society, conjugal fellowship, love, affection, consortium and companionship of her husband, and will continue to suffer those losses in the future.

184.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered past, present and future shame, humiliation, medically significant emotional distress, loss of enjoyment of life and anger.

WHEREFORE, Plaintiffs pray for a judgment against the Defendants in an amount that is fair and reasonable for actual and compensatory damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

<u>**COUNT IV**</u>
**OUTRAGE**
**All Plaintiffs against All Defendants**

185.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs above as if fully restated herein.

186.    Defendant Wisner, while operating in a medical context, within the scope of his job duties, and precipitated by Plaintiff seeking medical care, engaged in outrageous conduct that was in reckless disregard of the Plaintiffs' wellbeing.

187.    Defendants United States of America and United States of America, in the context of providing the Plaintiffs medical services, engaged in outrageous conduct by abdicating all

responsibility to supervise Defendant Wisner appropriately, in reckless disregard of Plaintiffs' wellbeing.

188.    Defendant Wisner's conduct was extreme and outrageous by any reasonable standard and in any community in America and goes beyond the bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized society.

189.    The conduct of Defendant United States of America was extreme and outrageous by any reasonable standard and in any community in America and goes beyond the bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized society.

190.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered past, present and future shame, humiliation, medically significant, extreme and severe emotional distress, loss of enjoyment of life, lost sleep and anger.

WHEREFORE, Plaintiffs pray for a judgment against the Defendants in an amount that is fair and reasonable for actual and compensatory damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

<u>**COUNT V**</u>
<u>**BATTERY**</u>
<u>**All Defendants**</u>

191.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs above as if fully restated herein.

192.    Defendant Wisner, while operating in a medical context, within the scope of his job duties, committed a battery upon the Plaintiffs by offensive contact without any justification.

193.    Defendants United States of America and Agency are vicariously liable for Defendant Wisner's conduct, as the United States of America is responsible for all intentional torts committed by its employees in the context of providing medical services to the plaintiff.

28

194.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered past, present and future shame, humiliation, medically significant, extreme and severe emotional distress, loss of enjoyment of life, lost sleep and anger.

WHEREFORE, Plaintiffs pray for a judgment against the Defendants in an amount that is fair and reasonable for actual and compensatory damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

## COUNT VI
## INVASION OF PRIVACY – INTRUSION UPON SECLUSION
### All Defendants

195.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs above as if fully restated herein.

196.    Defendant Wisner, while acting within his scope of employment, intentionally interfered with Plaintiffs' seclusion.

197.    Defendant Wisner, while acting within his scope of employment, pried into Plaintiffs' personal affairs and concerns by asking questions about their personal life, sexual activities and genitalia during a medical examination.

198.    A reasonable person would be offended by Defendant Wisner's intrusive conduct.

199.    Defendant Wisner's intrusive conduct served the interest of his employer in that the information elicited and the questions asked could have obtained medically relevant information.

200.    Wisner's intrusive conduct, however, was not medically necessary, was overly intrusive and improper.

201.    As a direct result of Wisner's conduct, Plaintiffs suffered extreme, long-lasting, medically significant emotional distress for which medical treatment is necessary, as well as violation

of his privacy interest.

202.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered past, present and future shame, humiliation, medically significant, extreme and severe emotional distress, loss of enjoyment of life, lost sleep and anger.

WHEREFORE, Plaintiffs pray for a judgment against the Defendants in an amount that is fair and reasonable for actual and compensatory damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, for interest at the highest lawful rate, and for such other relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL.

Plaintiffs request a jury trial on all claims asserted herein.

## DESIGNATION OF PLACE OF TRIAL

Come Now, Plaintiffs, and hereby designate Kansas City, Kansas, as the place of trial.

Respectfully submitted,

/s/ Aaron C. McKee
Aaron C. McKee, KS20889
McKee Law, L.L.C.
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420
aaronmckee@mckee-law.com

/s/ Sarah Brown
Sarah Brown, KS12130
Dan Curry, KS22750
BROWN & CURRY, LLC
406 W. 34th Street, Suite 810
Kansas City, MO 64111
Phone: (816) 756-5458
sarah@brownandcurry.com
dan@brownandcurry.com
**ATTORNEYS FOR PLAINTIFFS**